## HAMILTON BEACH MFG. CO. v. P. A. GEIER CO.

(Circuit Court of Appeals, Seventh Circuit. January 4, 1916.)

No. 2209.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—VIBRATOR.
   The Kirby patent, No. 891,776, for a vibrator for movement cure purposes, *held* not anticipated, valid, and infringed.

2. PATENTS ☞66—ANTICIPATION—PATENTS IN PRIOR ART.
   A patent speaks as an anticipation from the date of its issue, and not from the date of filing of the application.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. ☞66.]

3. PATENTS ☞165—VALIDITY—DUPLICATION OF CLAIMS.
   A claim of a patent in suit will not be held invalidated by other claims not in suit, except in clear cases of duplication.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ☞165.]

4. PATENTS ☞20, 244—INFRINGEMENT—REVERSAL OF PARTS—"INVENTION."
   There is no invention in the mere reversal of parts, when the result produced is the same, nor does such reversal avoid infringement.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 20–22, 385; Dec. Dig. ☞20, 244.
   For other definitions, see Words and Phrases, First and Second Series, Invention.]

Appeal from the District Court of the United States for the Eastern District of Wisconsin; Ferdinand A. Geiger, Judge.

Suit in equity by the P. A. Geier Company against the Hamilton Beach Manufacturing Company. Decree for complainant, and defendant appeals. Affirmed.

This suit involves claims 9 and 13 of patent No. 891,776, granted to J. B. Kirby June 23, 1908, for a "vibrator for movement cure purposes," and now owned through mesne assignments by appellee. Those claims read as follows, viz.:

"9. In vibrators, an electric motor and an applicator having vibratory connection with said motor, in combination with a speed regulator for said motor comprising a brush holder having frictional supporting parts and rotatably supported in respect to the field of the motor to vary the speed of the motor."

"13. In vibrators, a hollow body and an electric motor supported therein, and a shifting brush holder for said motor comprising a rotatable spring support frictionally engaged with said body, in combination with an applicator and a vibratory support for said applicator operatively connected with said motor."

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"The general purpose of my invention," says the specification, "is to produce a rotary vibratory movement by simple and durable means comprising in part a yielding fulcrum support for the applicator adapted to minimize friction and wear. A further object of the invention is incorporated in the shifting brush holder adapted to vary the speed of the motor and the vibratory movement of the applicator."

Figs. 1 to 5 of the drawings are herewith reproduced:

The specification reads:

"A two-part hollow body is shown which consists of a main section *2* of semi-spherical shape, and an extended section *3* secured thereto by a pair of bolts or screws *4*. Main section *2* provides a housing support for an electrical

motor, the field cores 5 of which are clamped between shoulders 6 of the respective body sections when joined together.

"Armature 7 of the motor is supported centrally between the field cores by shaft ends 8 and 9 which have their respective bearings in bushing 10 in main section 2, and in a cross-piece 11 secured in place between the sections at their joint line and by bolts or screws 4. The commutator 12 of armature 7 is arranged adjacent to bushing 10, and said bushing rotatably supports brush holder 14 centrally between its ends and said brush holder has a pair of spring-pressed carbon brushes 15 engaged with the commutator and confined within insulating tubes 16 mounted in the cylindrical brush holder ends 17. Brush holder 14 is made of spring metal and has a split-sleeved bearing engagement with bushing 10 and also a flat bearing engagement at 18 with body section 2, and the holder is bent or bowed to maintain frictional engagement at lips 19 of ends 17 against edges 20 of elongated openings 21 within the sides of body section 2, and through which the brush holder ends extend to be grasped by the fingers of the operator for rotating said brush holder on its axis and in respect to the commutator and the fields, and whereby the speed of the motor is governed and a corresponding change in vibration is obtained. The frictional engagement between the brush holder ends and stationary body section 2 firmly holds the brush holder in any position as set, and the ends are so disposed in respect to handle 22 of the device and in such close relation thereto that the operator may conveniently operate the brush holder with the thumb of the hand grasping the handle. Obviously, this arrangement of a speed-regulating brush holder constructed as a part of the device is of material advantage in giving treatments where the other hand of the operator may be otherwise employed.

"The rotary movement of the motor armature is utilized to impart a gyratory and vibratory movement to applicator 23 and its supporting member 24 by a crank stem 25 secured off center at the end of armature shaft end 9 and inclined axially in respect thereto, but sleeved centrally and axially within tubular supporting member 24. This result, of course, would not be obtainable without a fulcrum support for said member, and which, in this instance comprises novel means adapted to yieldingly resist end pressure upon the applicator and also lateral pressures upon the same and its support, and whereby friction and wear is reduced to a minimum, thus assuring long life and durability to the device at a point where the strain and wear is greatest. To this end, a pair of fulcrum members 26 are provided which are made of spring wire having a straight middle portion 27 adapted to be rotatably mounted within bores 28 in the tubular end of body section 3 and which members are further provided with angularly bent fulcrum ends 29 adapted to seat at their pointed or rounded extremities in sockets 30 in opposite sides of supporting member 24. It will be noted also that the angular relation of fulcrum end 29 to the middle portion 27 is such that a lateral pressure upon applicator 23 and its support 24 against the extremities of the fulcrum ends 29 will tend to rotate fulcrum members 26 at their middle portion 27 within bores 28. This tendency is spring-counteracted by inner right-angled ends 30' of members 26 which engage at their free ends with lugs or stops 31 integral with the inner wall of section 3. A yielding play in various directions is thereby given to the fulcrum support 24 which relieves the strain on crank stem 25, although said stem is also preferably backed up by a spring 32 mounted upon the right-angled end of said stem and bearing against the shaft to yieldingly hold said stem to its seat, and which provides for a limited amount of irregular movement of said stem and prevents rattling and noise. The spring wire for these parts is preferably piano wire of suitable gage, and in practice the construction as described has been found to stand up for indefinite periods without breaking and without appreciable wear and making an ideal fulcrum support for the uses and purposes set forth.

"A screw cap 33 attached to the end of section 3 incloses the fulcrum members and provides a neat finish for the device at this point. Any suitable oiling medium may be employed between the operating parts, but as here shown self-oiling felt washers 34 are used, which are sleeved over tubular member 24 and pressed into a side slot 35 and into engagement with stem 25. The

electrical connections between the fields and the brushes consist of flexible tinsel cords *36*, and the line connections are made through the hollow handle *22*."

Appellee's expert Geier explains the construction of the motor in suit, the operation and how the movable brush mechanism is made to cause the armature of the motor to rotate at different speeds, as follows, viz.:

"This motor consists of two field cores which are magnetized by coils of wire through which electric current passes, and the armature consists of a metal core or body with numerous slots containing coils of wire, and by the current passing through these coils successively, as the armature is revolved, various sections of this armature are successively magnetized and the shifting of the brushes magnetizes relatively different sections of this armature in relation to the field cores or magnets; or increases or decreases the 'lead' of the commutator with relation to the various sections of the armature. It might perhaps be clearer to state that a given section of the armature can receive its magnetism through the electric current passing through the corresponding coil on the armature, at an earlier or later point in its revolution with respect to the field magnets thereby increasing or decreasing the speed of the armature. The electric current passes through one of the wires, through the coils, around the field magnets, thence through a brush into a section of the armature winding, and out through the other brush. The passage of the current through the coils of the field magnets, magnetizes them, and the passage of the current through a section of the armature magnetizes the armature, whereby the field magnets attract the magnetized armature and pull it around. The different sections of the armature windings end in commutator segments so that as the armature revolves different windings are successively brought into contact with the brushes, thereby shifting backwards the magnetized parts of the armature as the armature rotates forward, so that the field magnets cause a continuous rotation of the armature. Shifting the brushes backwards, against the rotation of the armature, causes a given section of the armature to become magnetized sooner than it would otherwise have done so, and thereby increases the speed of the motor."

The use of brushes in electric motors for varying the speed is concededly old. The means specified in the claims constitute what is claimed as new. Kirby, it is claimed, provided a spring-actuated friction device capable of producing a substantially constant pressure for retaining the rotatable brush holder in adjustable position against the disturbing influence of excessive vibration at the same time affording it almost unlimited adjustments at the will of the operator. This vibratory action is extremely wearing on the machinery and requires simple and strong constructions.

Appellant's vibrator consists of "an electric motor and applicator having vibratory connections with said motor, in combination with a speed regulator for said motor, comprising a brush holder having frictional supporting parts and rotatably supported in respect to the field of the motor to vary the speed of the motor. It also consists of a hollow body or casing which supports the said motor and a shifting brush holder for said motor comprising a rotatable support frictionally engaged with the said body by means of springs in combination with an applicator and a vibratory support for said applicator operatively connected with said motor. The exhibit in question has two brush holders consisting of brass tubes clamped to a fiber washer which revolves about the armature shaft and is frictionally engaged against the top of the casing by two flat springs which are notched or serrated to supplement the friction of the above described washer against the cap. The purpose of the above described rotatable brush holder is to vary the speed of the motor and it does this."

It is charged to infringe claim 9 because it is a vibrator which has embodied in its construction an electric motor, an applicator having vibratory connection with the electric motor and a speed regulator for the electric motor comprising a brush holder rotatably supported in respect to the field of the motor to vary the speed of the motor, the brush holder having a spring member to hold the brush holder in different positions of adjustment, and being frictionally engaged with the body portion to support the brushes in their proper

relation to the commutator of the armature and to prevent these brushes from being rotated while so supported, and at the same time remain in whatever position they may be set without the need of other fastening and to hold the brushes from rotating because of the rotation of the armature or from ordinary handling. "I find [in appellant's device] a black washer," says appellee's expert Geier, "of nonconducting material, probably fiber, supporting two brush holders, said washer being rotatably supported in the hollow body of the vibrator and supported in this position by two flat springs, essentially for the purpose as the construction described in claim 13."

The reason for varying the speed of a motor in connection with an applicator is to vary the number of vibrations. In appellant's vibrator the springs of the brush holder support are stationary as against Kirby's rotatable spring brush holder. The two methods, says appellant's expert Driver, are mechanical equivalents. This admission the expert later sought to modify. Appellant's flat springs are ribbed or serrated as stated above, which fact, he claims, serves to increase the friction of the washer against the cap.

A number of patents were introduced by appellant from the prior art on what may be termed the rehearing. Of these, it will suffice to consider the Slater patent, No. 404,661, dated June 4, 1889, for an electric motor; Pengnet's patent, No. 595,731, granted December 21, 1897, for an electric motor; Wantz patent, No. 742,534, granted October 27, 1903, for a massaging implement; Kimble patent, No. 1,004,437, granted September 26, 1911, for an alternating current motor; and Clark patent No. 854,983, granted May 28, 1907, for a massage machine. Besides these the record contains certain alleged prior uses and devices. Of these, the vibrasage machines, the Victor motor, the Truax-Pfanschmidt vibrators, and the Slater and Farmer patents, so appellee claims, operate with a flexible shaft and are not self-contained in the sense in which Kirby operates, thus avoiding the high vibration. This shaft arrangement presupposes a stationary type of motor and a rotatable instead of vibratory connection between the motor and implement operated, and also freedom from any resultant motion communicated from the implement to the motor.

The record in the case consists largely of affidavits and stipulations entered into by the parties, with a view to settling all the questions between the parties and avoiding future litigation. Thus the court was in possession of all facts deemed necessary for a final disposition. The District Court, on the record as it first stood and as it came to this court in the first instance, found the issues for the appellee. Afterwards, when appellant represented to this court that a large amount of pertinent evidence had been inadvertently overlooked, the District Court at our suggestion reconsidered the case in connection with the later case of Geier Co. v. Julius Andrea & Sons Co. et al., pending in the District Court (no opinion filed), and held that cause in statu quo. All of the pertinent defenses, however, advanced in the later suit, are here presented for determination through stipulations of the parties. That record is before us, invested with the same force and effect as though regularly taken on the first hearing herein.

The errors assigned assail the decree of the District Court on the ground of the alleged invalidity of the patent because of anticipation in the prior art, and want of patentable novelty as being a mere aggregation, and the absence of proof to sustain infringement. Other facts appear in the opinion.

Flanders, Bottum, Fawsett & Bottum, of Milwaukee, Wis. (Charles W. Hills, of Chicago, Ill., and E. H. Bottum and F. E. Dennett, both of Milwaukee, Wis., of counsel), for appellant.

Francis J. Wing and Albert Lynn Lawrence, both of Cleveland, Ohio, for appellee.

Before BAKER, KOHLSAAT, and ALSCHULER, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above).
[1] An understanding of just what appellee claims as the invention in

suit may serve to simplify the task of unraveling the many apparent snarls in the theories of the parties hereto. It must be borne in mind that the claims in suit cover a combination patent embracing a number of elements, all of which, or their equivalents, are essential.

Considering first claim 13, there is the hollow body, an electric motor supported therein, including the field structure and armature, a shifting brush holder composed of a rotatable spring support friction-ally engaged with the body of the device, an applicator, a vibratory support therefor connected up with the motor. Appellee's counsel say in their supplemental brief:

"Kirby found it necessary, for his particular purpose, to augment the normal frictional engagement by laterally acting spring pressure, and such augmented friction without doubt is the intent of his patent."

And again:

"Kirby * * * was the first to equip and manufacture manually oper-able electric vibrators with the compact frictional or spring retained mounting for the adjustable brushes, whereby the speed of the propelling motor might instantly be varied by the user as conditions required."

Thus it appears that what the patentee claims is a self-contained hand vibrator, in which the brushes are so adjusted with reference to the commutator and other parts as to cause the brushes to bear continu-ously, under constant pressure, in their adjusted positions until a change therefrom is desirable, against excessive vibrations and other disturbing influences. In this way the operator secures even advance-ment or backward movement of the brushes. This seems to result from the resilient material and arrangement of the brush holders and the frictional engagement at lips 19 of ends 17 against edges 20 of the elongated openings 21 through which the brush holder ends extend to be grasped by the operator for rotating the brush holder on its axis and in respect to the commutator and the field, whereby the speed of the motor is governed and a change in the vibration is obtained. The specification says, "The frictional engagement between the brush hold-er ends and stationary body section 2 firmly holds the brush holder in any position as set, and the ends are so disposed in respect to handle 22 of the device" that the operator may move the brush holder with his thumb and employ but one hand in manipulating the vibrator.

The result attained and claimed as new was the even and easy manip-ulation of the brush holders back and forth across the commutator sections for speed regulation, as against methods in the prior art in which devices are shown for locking, sub modo, the movement of the brushes or retaining them in fixed positions, either arranged before-hand or operated by lever or otherwise into and out of what may be termed locked positions, requiring a step by step advancement or re-versal. Thus, in the Slater patent, the adjustment of the brushes is regulated by rotating the brush holder arm, having a series of small cavities on its inner face, against a fixed spring pawl or detent in the frame, which detent is adapted to spring into and out of the cavities as required. Manifestly, the movement of the brushes would, in that case, be a kind of step by step, or articulated or jerky movement, if firm enough to hold against great vibratory action only when the detent

is in the cavities prepared for it. In any case it must lack the even, steady frictional movement of the patent in suit. Then, too, it is capable of acting in only a few—that is, some six—positions, while the Kirby frictional action is continuous throughout the whole range of brush movements. We are unable to say that there is any spring or frictional element in the actuation or movement of the Slater device. Evidently the Slater device has no vibratory connection with an applicator, nor does it appear that it ever went into any appreciable public use. The word "spring" as used in this device does not seem to imply resiliency, since the so-called spring pawl or detent is freed from the cavities through the interior wedging action of the manually operated brush holder arm.

Appellant finds what it considers indications of speed adjustment in the ebonite ring of the Pengnet patent, which rotatably mounts the brushes of the motor in that device. This ring is provided with teeth which mesh with a cogwheel "so that the brushes may be adjusted by turning the cogwheel to rotate the ebonite ring $H$," thereby setting and holding the brushes in their effective positions. It is in no sense a speed regulator. The speed is regulated by a rheostat or a reducing gear. This ebonite ring, together with its connections, constituting the brush adjusting device is contained within the casing and evidently not intended to form a speed regulator. No applicator is shown.

[2] The Kimble patent was granted September 26, 1911, upon an application filed May 15, 1905. While the patent was granted subsequently to that in suit, the application was prior. As we have often held, a patent speaks as an anticipation from the date of its issue and not from the date of filing the application. Both the Kimble patent and the alleged Kimble prior motor show no means for stationing the brushes against rotation other than manual action. The means for altering the speed of the armature consists of a sleeve, rotatable upon a hollow shaft and carrying the brushes which bear upon the commutator.

The Adams-Randall vibrator is not self-contained. Its speed regulating provision is exterior of the case. It consists of varying sets of batteries or resistances which may be cut into and out of circuit. Manifestly it does not anticipate the device of the patent in suit, nor does the Wantz device so anticipate. Louis E. Samms, who is an agent for this latter device, says Wantz never has employed brush shifting apparatus for small motors, and that the brushes were equipped at the factory and made normally inaccessible by the surrounding casing.

[3] We have examined the other patents, prior uses and devices cited, and find none of them to anticipate the device of claim 13 when construed as above stated. Nor do we deem said claim, as construed by us, rendered invalid by reason of the character of the remaining and here unasserted claims of the patent. It covers features not included in any of the other claims. Moreover, we are not disposed to insist on a strict application of the principle invoked, except in cases where there is unquestionable evidence of duplication of claims. Such is not the case here. The same is true of claim 9. It omits the hollow body and the location therein of the motor, and differs from claim 13 in a number of respects, and is, in our judgment, sufficiently distinct from the

remaining claims to escape the condemnation imposed by appellant. It states the concept of claim 13 in a different and modified way. It calls for vibratory connection with the motor and the speed regulating arrangement comprising the brush holder having frictional supporting parts, and rotatably supported in respect to the field of the motor to vary the speed of the motor.

Construed as above, we hold the claims in suit to be valid. The claims contemplate rather elements to effect a definite result than of a specific mechanical form, and should in our judgment be so construed. Appellant's vibrator has appropriated the concept of Kirby as a unitary machine. "The constructions of defendant's [appellant's] vibrators and the vibrator of the Kirby patent in suit are mechanical equivalents for holding the brushes in selected positions of adjustment for the purposes desired," said appellant's expert in an unguarded moment. Notwithstanding the witness' modification of this admission thereafter, the proposition seems to be true. Appellant's two corrugated springs constitute the equivalent of opposing walls of the elongated openings *21* of appellee's device, while the rotatable supporting disc is forced thereby against the recessed casing to frictionally engage the casing throughout all positions of adjustment of the brushes. This affords the frictional engagement intended by claim 9. The corrugations of appellant's device serve little or no other purpose than to increase the friction so as to hold the brushes in any position. The inner frictional bearings of both devices against the interior of the frames, adjacent to the motor shaft, are identical, and the stationary mounting of the springs of both attain the same result. Appellant plainly has the spring-pressed frictional engagement of the brush holder with the casing. These springs with the casing comprise frictional supporting parts as covered by claim 9, and when associated with the insulating disc comprise a rotatable spring support frictionally engaged with the body as covered by claim 13.

Both of the claims may be read upon appellant's vibrator. We regard the rotation of the springs as the equivalent of the stationary mounting thereof in the devices under consideration. Appellant's corrugated springs must be sufficiently resilient to hold the brush holder and its friction disc within its recess in the frame. By bearing upon the brushes, the frictional force of these springs, augmented by whatever of detaining action is produced by the corrugations, affords such frictional engagement on the disc side of the brush holder as will hold the brushes in any position of adjustment.

[4] There is no invention in the mere reversal of parts when the result produced is the same. Adam v. Folger, 120 Fed. 260, 56 C. C. A. 540. Appellee's brushes are mounted upon a rotatable bowed spring which bears against the body or frame laterally for frictionally retaining the brushes in position. Appellant uses two nonrotatable springs which serve to conduct current to the brushes, while at the same time they supply frictional engagement between the annular, rotatable brush holder and the casing of the alleged infringing vibrator. The concept of the latter succeeded and was evidently suggested by the patent in suit. The Kirby vibrator provides a hand supported device with self-contained brush adjustment—self-contained speed controlling means, which, as

above stated, were new with Kirby. This, appellant has appropriated. Its utility the appropriation of the device by appellant serves to concede.

The decree of the District Court is affirmed.