CAMP BROS. & CO. v. PORTABLE WAGON DUMP & ELEVATOR CO.

(Circuit Court of Appeals, Seventh Circuit. June 24, 1917. Rehearing Denied June 24, 1918.)

No. 2241.

1. PATENTS ⟨⟩328—VALIDITY—INFRINGEMENT.
Inks patent, No. 684,064, claim 1 of which was for combination dump and elevator and means for operating the dump and elevator simultaneously, *held* not anticipated; also, *held* infringed.

2. PATENTS ⟨⟩73—ANTICIPATION—DATE OF ISSUE.
A patent speaks as an anticipation from the date of its issue, and not from the date of the application.

3. PATENTS ⟨⟩61—APPLICATION—DISCLOSURE.
Until a patent is issued the public have no right of access to the application, and so until issuance of the patent the application cannot be regarded as a prior foreclosure or publication of matters set forth therein.

4. PATENTS ⟨⟩69—PUBLICATION—WHAT CONSTITUTES.
Public disclosure or publication, to be effective as such, must be a revelation of an invention so publicly disclosed as to raise a presumption that the public would know of it; so, where an application for patent is filed and a division of specifications ordered, the patent being issued on the specifications as divided, matter contained in the original specification cannot be deemed disclosed, for only the file wrapper would indicate its existence.

5. PATENTS ⟨⟩130—INVENTION—PRESUMPTION.
The date of an invention of a patented article is presumptively the filing date of the application, where this shows clearly the thing patented; but the patentee may, of course, show earlier invention date.

6. PATENTS ⟨⟩53—INVENTION—EXPERIMENT.
Though a patent application suggested a device later invented and patented by another, yet where no patent therefor was granted, and no such device constructed or brought into use, the suggestion in the application does not show prior invention.

7. PATENTS ⟨⟩102—VALIDITY—VERIFICATION.
Where the amended application for a patent did not present a conception materially different from or enlarged over that shown by the original application, no new oath is necessary.

Appeal from the District Court of the United States for the Northern Division of the Southern District of Illinois.

---

Suit by the Portable Wagon Dump & Elevator Company against Camp Bros. & Co. From a decree for complainant, defendant appeals. Affirmed.

Albert H. Graves and Charles K. Offield, both of Chicago, Ill., for appellant.

H. H. Bliss, for appellee.

Before BAKER and ALSCHULER, Circuit Judges, and LANDIS, District Judge.

ALSCHULER, Circuit Judge. [1] The decree appealed from found valid and infringed claim 1 of appellee's patent, No. 684,064, issued October 8, 1901, to I. N. Inks. The patent, as stated in the application therefor, "relates to wagon dumps or devices for elevating one end of the wagon to such an extent that the contents of the bed will fall out at the other end." In the '80's and '90's there seems to have been a growing demand for a portable device usable on the farm, whereby the farm wagon loaded with grain might be readily dumped, and the load lifted by power (usually horse power) into cribs, bins, or other receptacles. The convenience and utility of operative contrivances of this sort is manifest in the economy of labor and time effected through their employment.

So far as the development of the art is shown through patent grants, the record discloses Seeley's patent, No. 410,336, 1889, which presents a machine in which the loaded wagon was driven onto a dumping platform, the wheels resting upon pivoted dumping timbers, so supported that the operator, by manually releasing a holding mechanism, causes the dumping timbers to so tip or tilt that the rear of the wagon is dropped down sufficiently to cause the load to flow from it and into a hopper at its rear. The horses which hauled the wagon in the meantime are standing on a tread power, which they operate, and set in motion the mechanism which drives the elevator, consisting of a series of buckets attached to a revolving belt, whereby the grain in the hopper is raised to the required height, and dropped into the receptacle therefor. When the load has been thus elevated, the dumping timbers are manually raised, restoring the wagon to its level position for hauling it away and making room for the next wagon load, and so on.

Schroeder, No. 598,119, 1898, shows a contrivance in which the dumping device is hand-operated, as in Seeley, and in which respect both these inventions are distinguishable from that of Inks. Then there are patents to Kidd, No. 630,239, August 1, 1899, and No. 660,992, October 30, 1900. The first was applied for June 6, 1896, and the patent was granted after division of the application had been ordered and made. The divisional application was filed December 22, 1898, and thereon Kidd's second patent was issued.

Kidd's first patent shows a device whereby the wagon is hauled upon the dumping members, which are manually operated and tip the wagon, dumping its load into a receptacle sufficiently large to receive it. Thereupon, by the same power which actuates the elevating machinery, the receptacle holding the load is gradually lifted, and its contents dumped upon a cross-conveyor operated by the same power,

and carried to the boot of the elevator, whence by the same power it is elevated. The elevator is operated simultaneously with the lifting and dumping of this receptacle. The substantial difference between this and the Inks construction is that in Inks the load is dumped directly from the wagon upon the conveyor or elevating means, whereas, in this Kidd device, the load is first dumped into the intermediate receptacle, from which it is in turn dumped for elevating as indicated.

In the second of Kidd's patents the raisable intermediate receptacle is omitted, and the load is dumped from the wagon into a stationary hopper, from which it falls upon the conveying or elevating means. The wagon is tilted and its load dumped by the same motive power whereby the elevating is effected. The device shown in the drawings of this last-named patent illustrates this stationary receptacle or hopper sufficiently large to receive at once the entire wagon load. From this, and from certain expressions in the specifications, it is contended that the dumping of the wagon and the elevating are thereby contemplated to be successive, and not simultaneous, operations, and herein it is claimed for appellee that this Inks structure patentably differs from this disclosure of Kidd. It is claimed for appellant that this disclosure by Kidd responds fully to Inks' claim 1, and that the claim is void. Inks' claim 1 is as follows:

"The combination, with a dump and an elevator, of means for operating the dump simultaneously and from a common motor with the operation of the elevator, substantially as described."

The specific concept patentable over the prior art, asserted to be secured to Inks by this claim, is the operation of mechanism for raising the front end of the wagon to dump its load, at the same time that the elevator is by the same power being operated to raise and dispose of the grain while it is being so dumped. Thereby the use of a hopper large enough to hold the entire wagon load was dispensed with, and time was saved in the operation, which would be lost in the successive operation of dumping and elevating, in that the elevating process would begin when the grain began to flow from the wagon to the hopper, saving in the complete operation the time required for dumping, estimated by the witnesses to be about a quarter of a minute, during which the elevator would be idle, if the two functions operated successively, and not simultaneously.

In the machine actually described and illustrated in Kidd's second patent, the fact that the receiving hopper is of sufficient capacity to hold the entire wagon load, coupled with the fact that in the construction so shown the gears and belts are not so arranged and correlated as to provide for simultaneity of operation of the dump and elevator, makes it plain that the invention of Inks' claim 1 is not there shown. But it is contended that by the making of a few simple changes in the arrangement of the gears and belts, such as any mechanic of ordinary skill could readily make, the simultaneous operation might have been effected. This might be true enough after the idea of the simultaneity of the two operations had been suggested to the mechanic. It cannot be said that this idea would be plainly apparent, notwithstanding the facility with which the machine might

be adapted to incorporate it. An illustrative machine claimed to have been constructed under the teachings of this Kidd patent showed the simultaneity of operation of both functions by a common motive power, as is indicated in Inks' claim 1.

Appellee contends the machine is not the embodiment of Kidd, but is changed in the light of Inks and shows Inks' invention. Appellant claims that the changes in the illustrative machine from Kidd's construction are but simple changes in gears and belts, such as would suggest themselves to one of ordinary mechanical skill. This may be so, if the mechanic had conception of the simultaneity of operation. With this concept revealed to him it might well be said that such simple changes would effect the result. In the conception of the simultaneity of operation by the common power, plus the mechanical changes necessary to attain it, in our judgment resides invention, and not merely mechanical skill.

[2, 3] But appellant insists that the specification of Kidd's first application as originally filed, as well as of the divisional application under which his second patent was granted, fully shows the entire combination of Inks' claim 1, and that in any event the illustrative machine embodies in this respect that which the Kidd application so pointed out. The part of the specification thus referred to is as follows:

"If desired, such connections may be made between the platform *101*, the power shaft *20*, and the elevator as will lift and tilt the wagon gradually, and operate the conveyer and elevator rapidly, so that, when the wagon is tilted sufficiently to discharge the last portion of the load into the hopper, nearly if not quite all the contents of the hopper will have been removed and elevated. If such connections are made, the hopper may be of less capacity, sufficient only to receive a portion of the load gradually until all of the load has passed through said hopper. With such an arrangement the platform *101* could be fulcrumed materially closer to the ground, and by so doing the hauling of the wagon several inches in elevation might be avoided."

It is insisted for appellee that this language contemplates alternate action of the dumping and elevating operations; i. e., a partial dumping of the wagon, then an elevation of what is dumped, then further dumping and further elevation, alternately, but not simultaneously, as in Inks. We do not think that the quotation contemplates such alternating operation. "Lift and tilt the wagon gradually" and "operate the conveyer and elevator rapidly" indicate such relation of these functions that, as stated, when the last of the load is dumped, "nearly if not quite all of the contents of the hopper will have been removed and elevated." Of course, neither in Inks nor in Kidd could the two functions be wholly completed at the same instant, for that which is elevated must in the order of things be first dumped, and of necessity the dumping must begin before the elevating starts, and, to elevate the entire load, that process must in any event continue for a brief period after the dumping ceases.

The disclosure in the quoted part of the application might have supported a claim by Kidd in his second patent, similar to Inks' claim 1. But Kidd's patent shows no such claim, and it does not appear that prior to Inks any machine in this or any related art had been built which embodied the elements of that claim.

Kidd's second patent could not of itself be considered an anticipation of Inks' claim, or in the prior art. Inks' application was filed August 28, 1900. Kidd's second patent was granted October 30, 1900. A patent speaks as an anticipation from the date of its issue, and not from the date of application for the patent. Bates v. Coe, 98 U. S. 33, 25 L. Ed. 68; Hamilton Beach Mfg. Co. v. Geier Co., 230 Fed. 430, 144 C. C. A. 572; Gen. Elec. Co. v. Allis-Chalmers Co. (C. C.) 190 Fed. 170; Diamond Drill, etc., Co. v. Kelly Bros. (C. C.) 120 Fed. 282. Nor is what is the quoted part of the specification of Kidd's second patent to be regarded in the light of a prior disclosure or publication of the Inks invention, for at the time Inks filed his application Kidd's second patent had not been granted, and neither Inks nor the public had then any right of access to Kidd's application. Patent Selling & Exporting Co. Actieselskabet v. Dunn, 213 Fed. 40, 42, 129 C. C. A. 634; Gray Telephone Pay Station Co. v. Baird Mfg. Co., 174 Fed. 417, 98 C. C. A. 353; Sundh Electric Co. v. Interborough, etc., Co., 198 Fed. 94, 117 C. C. A. 280; Vacuum Engineering Co. v. Dunn, 209 Fed. 219, 126 C. C. A. 313. In the last case the court said:

"His application was confidential; the public could not see it or be informed of its contents until patent issued upon it. Before that date came Locke & Dunn with their application."

[4] But the quoted portion of Kidd's application for his second patent appears also in his original application filed June 6, 1896, for his first patent, which was granted August 1, 1899, before Inks' filing date. In this patent as issued the quoted part of the specification does not appear, having been eliminated by amendment made under order for division by the Patent Office. But is this such prior public disclosure or publication as would invalidate the Inks claim? Public disclosure or publication to be effective as such must be a revelation of an invention so publicly published or disclosed as to raise a presumption that the public concerned with the art would know of it. Where application for a patent is filed, and no change therein is made in the Patent Office, the specification as filed becomes part of the subsequently issued patent. But where changes in the application are made after filing, particularly where a division is ordered, and pursuant thereto certain features of the original application are eliminated therefrom, there is nothing in the issued patent to show the specification as originally filed, nor, indeed, anything to indicate that any specification was ever filed, other than the one which appears as part of the patent as issued. The file wrapper alone will disclose what the original application was, and what, if any, changes in the application intervened before issuing of patent. It is within the domain of possibility that as to every patent which has been granted the original application disclosed some other invention unrelated to that for which the patent issued, and which only an examination of the file wrapper would reveal. If, therefore, disclosure of invention other than that for which the patent was issued, but which only the file wrapper would reveal, is to be considered as prior publication within the meaning of the law, no patentee could be certain that there had

not been prior publication of his invention through its inclusion in some application as originally filed, unless every file wrapper in the Patent Office were searched to eliminate the possibility that the invention in question at some prior time had been in such manner disclosed. The resultant inconvenience of holding such contents of a file wrapper to be publication—indeed, the practical impossibility of making in each case the search necessary to learn whether or not there lies buried in some one file wrapper of the infinite number in the Patent Office, some paper disclosure of an invention, of itself, apart from its inherent want of the elements of a public disclosure—induces the conclusion that it may not be regarded as such a publication. In Walker on Patents (5th Ed.) § 60, it is said:

"Novelty is not negatived by any successful application for a patent, nor by any documents pertaining thereto, different from the letters patent issued in pursuance thereof. When such an application, or such a document, is offered to prove the existence of something which is not shown by the letters patent themselves, the justice and propriety of this rule is apparent."

And of the analogous situation of an abandoned application for a patent section 58 states:

"Novelty is not negatived by any prior abandoned application for a patent. Abandoned applications for patents are not, by the statutes, made bars to patents to later applicants. They furnish no evidence that the processes or things they describe were ever made or used anywhere. Being only pen and ink representations of what may have existed only as mental conceptions of the men who put them upon paper, they do not prove that the processes or things which they depict were even known in any country. Nor can they be classed among printed publications, for they are usually in writing, and are not published by the Patent Office." Interurban Ry. & Ter. Co. v. Westinghouse El. Mfg. Co., 186 Fed 166, 108 C. C. A. 298; Corn-Planter Patent, 23 Wall. 181, 211, 23 L. Ed. 161.

[5, 6] But it is insisted that the defense that Inks was not the original and first inventor is conclusively established by the fact that the application for the Kidd second patent was filed before the Inks application, there being no further evidence in the record on the subject of priority of invention as between them. The date of invention of a patented article is presumptively the filing date of the application, where this shows clearly the thing patented, with right, of course, to show by evidence an earlier invention date. But this presumption attaches only and in so far as the application results in grant of patent. If Kidd had been allowed a patent for substantially the combination which was awarded to Inks, the fact that Kidd's patent postdated that of Inks would nevertheless presumptively fix Kidd's filing date as the date of his invention. But Kidd's two claims made and allowed, as they appear in his patent, have no reference to a structure wherein there is simultaneity of operation of the dumping and elevating functions, actuated by a common source of power, as in Inks' claim 1. Although, as we have seen, Kidd's specification says in effect that this may be done, there is not in the specification or the grant, described, claimed, or patented to him, any device for doing it, and, of course, he could have had no patent for the function.

The language above referred to from Kidd's application, while having a bearing on the issue of prior invention, does not determine that

issue. No patent for such a device having been granted Kidd, the fact that the evidence fails to show that, prior to Inks, neither Kidd nor anybody else perfected or brought into use any such device as that which Kidd in the application merely suggested, "cannot take the case out of the category of unsuccessful experiments." The Corn-Planter Patent, supra; Wright Co. v. Curtiss Co. (C. C.) 177 Fed. 257; Philadelphia Fire Extinguisher Co. v. Northwestern Fire, etc., Co., Fed. Cas. 10,337. We do not think that the quoted words from Kidd's specification, under all that the record herein shows and fails to show, are sufficient to establish that Kidd, and not Inks, was the original and first inventor.

We find nothing in the Kidd patents or their applications which, either by way of anticipation, or of prior disclosure or publication, or prior invention, affects the claim in question. Nor are we impressed by appellant's contention of the want of patentable invention in the claim. The slight forward step which Inks made shows improvement of unquestioned utility, which, though foreshadowed in the Kidd specifications, had not before been reduced to practice, and is not to be found in any of the references to the prior art; and this, with the presumptive validity of the grant, fortified, as the record shows it to be, by long and general acquiescence, and by wide and substantial tribute, disposes of the defenses to the claim other than those of invalidity for want of oath to amended application and noninfringement.

[7] We find no merit in the contention of invalidity on the ground that the file wrapper shows no oath to Inks' amended application. We do not regard the amended application as presenting a conception materially different from or enlarged over that shown by the application as filed, and for such reason alone a new oath was not necessary. Steward v. American Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139; De La Vergne v. Featherstone, 147 U. S. 209, 13 Sup. Ct. 283, 37 L. Ed. 138.

The question of infringement remains. Defendant's machine, complained of, is substantially different in many respects from that described by the patent in issue, and it shows various features which are protected by patent issues junior to Inks. While we may concede to all such due advance in the art, yet it is not seriously controverted, and it plainly appears, that the claim in question reads fully and squarely on defendant's machine, which, notwithstanding other and possibly superior advantages it may possess, shows the combination with a dump and elevator of means for operating them simultaneously from a common motor as set forth in claim 1. There was no error in finding the claim infringed.

The decree of the District Court is affirmed.