EAST RUTHERFORD SYRINGES, Inc., Plaintiff,

v.

OMEGA PRECISION MEDICAL INSTRUMENT CO., Inc., Defendant.

EAST RUTHERFORD SYRINGES, Inc., Plaintiff,

v.

COMAR GLASS CORPORATION, a New Jersey corporation, Defendant.

Civ. Nos. 903, 1090.

United States District Court
D. New Jersey.

June 26, 1957.

Van Riper & Belmont, Newark, N. J., for plaintiff.

Kirschstein, Kirschstein & Ottinger, New York City, Harry B. Rook, Newark, N. J., for defendants.

WILLIAM F. SMITH, District Judge.

These are civil actions under the patent laws, and more particularly Section 281 of Title 35 U.S.C.A., for the infringement of claims 3 and 6 of Patent No. 2,505,411, issued on the application of Samuel Kolodny and Nicholas Micci, who, prior to the issuance thereof, assigned all right, title and interest therein to the plaintiff. The actions were consolidated for the purpose of trial.

The claims in suit cover and define a hypodermic syringe of the barrel and plunger type, a type in common use prior to the patent, but are directed particularly to an improvement thereon, to wit, the "volume indicia precisely positioned along the outer surface of (the) barrel member." The action is directed to similar syringes of which the defendants are admittedly the manufacturers and distributors. The defendants deny infringement and challenge the validity of the claims in suit.

### Invention of Patent.

The invention is defined in claim 3, which is typical, as follows: "A hypodermic syringe comprising, in combination, a barrel member; a plunger member slidably engaged in said barrel member; said members being formed of a transparent vitreous material and being finished to have a precision fluid type fit with each other; volume indicia precisely positioned along the outer surface of said barrel member, *Said Indicia Comprising Pigmented Material Fused With the Material of Such Barrel Member, and Flush With and Extending a Substantial Depth Beneath Such Outer Surface."* (Emphasis by the Court). The essence of the invention is in the last element.

A hypodermic syringe made of glass was known and had been in common use for more than fifty years. See the patent to Wulfing-Luer, No. 772,450, issued on October 18, 1904. The earlier syringe comprised three elements: first, a barrel made of glass or other transparent vitreous material; second, a plunger made of glass or other vitreous material slidably engaged in said barrel; and third, an engraved or etched volume indicia disposed along the surface of the barrel. The improvement thereon claimed by the patentees was the utilization of a stained volume indicia, as distinguished from the old etched or engraved indicia. The claims must therefore be construed as narrow.

The specifications recommend, at column 4, lines 5 to 20, that the volume indicia: "may be applied in any desired

manner capable of effecting a deep penetration of the indicia into the syringe member, an integral bonding thereof with the member, and a flush surface arrangement. For example, an opaque ceramic pigment, such as Amber Stain, may be mixed with a suitable liquid vehicle and the mixture applied to the surface of a syringe member *Through a Special Screen.* After fusing, baking and annealing operations, the stain is fused into the glass to a substantial depth and is flush with the outer surface. The annealing corrects any possible distortion due to the fusing and baking steps." (Emphasis by the Court.) The method described was admittedly old and had been in common use in the glass industry; the method was employed to produce on glass surfaces decorative designs and utilitarian marks. The plaintiff claims, however, that the patentees were the first to employ the known method to produce a stained volume indicia on the barrel of a hypodermic syringe.

When the claims in suit are construed in the light of the specifications, as they should be, it is apparent that the claim to novelty resides not in the utilization of a volume indicia however produced but in the utilization of a volume indicia produced only by the process described, the glass staining process in common use in the glass industry. The claims in suit are so drafted as to necessarily embrace the process by which the defined result is effected. The process and the result thereof are so interrelated that they are inseparable. The claims of the patent in suit, as well as the disclosures of the prior art references, must be read in the light of this fact if their full import is to be appreciated.

### Prior Art.

The many processes employed to stain glass were admittedly in common use in the glass industry long prior to the advent of the patent in suit. It was known that glass surfaces, when treated with heavy molecular salts, either in liquid or paste form, would absorb a color characteristic of the metallic salt which was used; the intensity of color, as well as the depth of penetration, were controllable by the treatment technique employed. These processes, although varying in technique were based upon the same chemical phenomenon; when the glass surface was treated under controlled conditions an interdiffusion between the electro-positive ions of the metallic salt and the electro-positive alkali ions of the glass surface occurred. The reaction imparted a color, characteristic of the metallic salt, which penetrated the glass surface without, however, impairing the contour of the surface. The utility of the process was generally recognized. *See Journal of the Society of Glass Technology, published in October, 1945.* The reference is significant only in that it briefly describes the reaction.

The processes were controllable and they were therefore adaptable to many uses in the glass industry; they were employed principally in the decorative arts, although they were also adaptable to utilitarian uses. It was known, for example, that delicate color designs could be imparted to the glass surface if the metallic salts were applied only in a delimited area. The delimitation was accompanied by the employment of a silk screen bearing the design; the metallic salts were applied through the silk screen. This method is particularly significant because it is the method recommended by the specifications of the patent. The method was undoubtedly old in the art.

The patent to Northwood, No. 1,217,-490, issued on February 27, 1917, covers "Improvements in Processes in Producing Decorative Color Effects on Glassware." The invention is defined in claim 1 of the patent as follows: "The method of producing decorative coloring effects on glassware, which consists of staining the ware with a copper sulphate solution, firing the ware to fix the stain, then applying to said ware a coating or partial coating of a silver salt solution, and finally refiring the ware." The invention as thus defined is obviously a variant of the

earlier method. The object of the invention was "to provide a method or process of producing glassware having variegated surfaces in which the colors are disposed in veins, in clouds, in mottlings, or in distinct groupings, presenting handsome marking effects resembling agate or some of the variegated varieties of marbles." It is apparent that the inventor employed nothing more than a variant of the known process to produce the desired result.

The patent to Kraus, 1,592,429, issued on July 1, 1926, relates, according to its express language, "to the art of treating, and specifically of marking, articles of glass, and consists in a method of treating glass which may be used for applying marks or designs, either of *utilitarian* or *aesthetic* purpose, upon glass * * *." (Emphasis by the Court). It is important to note that it is stated therein that: *"One of the objects* of this invention is to provide articles made of glass, as for instance optical lenses, with marks which are ordinarily invisible, but which are developable into temporary visibility at will"; it is further stated that "the object is to mark the glass without any alteration in its *superficial contour or optical characteristics."* (Emphasis by the Court.) It is apparent that since the process may be employed in the manufacture of optical lenses a precision mark is contemplated. This conclusion is supported by the specifications.

The specifications of the patent, page 2, recommend the treatment of a delimited area of the glass surface with a solution of silver nitrate under proper conditions. The specifications apparently contemplate a control of the reaction because it is therein stated: "If the replacement of sodium ions by silver ions is allowed to proceed *Only To a Very Slight Degree,* the pattern or mark outlined in silver ions in the glass will be wholly invisible, requiring other treatment to be rendered visible either temporarily or permanently." (Emphasis by the Court.) The patentee, however, recognized and disclosed, but without asserting a claim to invention, that further treatment under known methods would produce a permanent pattern or outline. It is stated, at page 3 of the specifications: "If silver ions are allowed or caused to penetrate a glass to a sufficient depth, the marking due to their presence becomes *Permanently Visible,* so that, for the purpose of marking optical glass, the diffusion of silver ions into the glass should be arrested before the *Permanently Visible Stage* is reached; or the glass should be subjected to further treatment, to render the marking normally invisible." (Emphasis by the Court.) It is clear that the claims are limited but the teachings of the patent are broad.

It is important to note that Kraus recognized, as did those who preceded him, that the process could be employed effectively without altering the geometrical contour of the glass surface, an advantage claimed by the owner of the patent in suit.

The patent to Nordberg and Rumenapp, 2,355,746, issued on August 15, 1944, covers a method which may be employed in the manufacture of wholly or partially colored glassware. It is stated therein, at page 1, that a feature of the invention "comprises incorporating (a) metal salt in a *Restricted Portion of the Article* to form a colored design within the body of the glass as by printing or stamping a solution of the salt on the porous glass in the desired design." (Emphasis by the Court.) The invention is defined in claim 1, which is typical, as follows: "The method of making a glass article, which comprises melting a glass, fabricating the same into a fixed shape, heat treating the article to render constituents other than silica soluble; dissolving out major quantities of the said other constituents to leave a highly silicous, substantially transparent porous article, *Impregnating at Least a Portion of the Porous Article with a Solution Containing a Salt of a Metal Which Will Color Glass and a Compound of Phosphorous, and Drying and Firing the Article to Close the Pores and Incorporate the Metal Into the Glass."* (Emphasis by the Court.)

The significance of the reference lies in its disclosure of a method which may be employed to produce in a glass surface any desired design, to wit, the treatment of a delimited area of the glass surface with any one of several metallic salts incorporated in a proper vehicle. The method does not differ substantially from the old method hereinabove discussed. It is recommended, however, at page 3: "If desired, the absorption or introduction of the metallic salt solution into the porous can be confined to any particular area of the article to produce therein any desired design. This is accomplished by increasing the viscosity of the solution by the addition of a viscous liquid such as glycerine and applying the viscous solution in the selected areas by means of a brush or a stamp. *The Well Known Silk Screen Process May Also Be Employed for This Purpose.*" (Emphasis by the Court.) The screen process requires the application of the metallic salt, preferably in paste form, through a silk screen.

The patent to Peterson, No. 2,498,003, issued February 21, 1950, in the language of the patent "relates to the treatment of glass to produce a red coloration in its surface with copper which is commonly known as 'copper staining' or 'red etching'." The claims of this patent cover nothing more than what is purported to be an improvement on the older methods. The invention is therein defined in claim 1, which is typical, as follows: "The method of obtaining a uniform coloration in the copper-staining of a soda-lime-silicate glass, which comprises first heating the glass in a reducing atmosphere, and thereafter applying the staining composition containing a compound of copper to the glass and heating the glass while in contact with said staining composition to develop color therein." It is recommended in the specifications that "Various designs can be produced by selective staining." It is obvious that the selective staining therein referred to may be accomplished by the utilization of a silk screen.

There are included in the brochure of prior art references the following patents: the patent to Farncomb, No. 2,026,086, issued in 1935; the patent to Shaver, No. 2,081,508, issued in 1937; the patent to Williams, No. 2,428,600, issued in 1947; the patent to Kreidl and Ohliger, No. 2,468,402, issued in 1949; and the patent to Kreidl and Ohliger, No. 2,486,566, issued in 1949. These patents do not require discussion. Their relevance lies in their disclosure of earlier methods employed to stain glass. They are significant only in that they assist in the general appraisal of the art as it existed prior to the patent in suit.

The references thus far discussed may not be regarded as wholly anticipatory because they do not embrace within their four corners the specific teachings of the patent in suit. They disclose the state of the art of glass staining as it existed prior to the advent of the patent in suit. They clearly demonstrate that at the time the present patentees entered the field there was available a fund of knowledge. It is therefore not without significance that the present patentees recommended in their specifications that the volume indicia, defined in the claims, "may be applied in any desired manner capable of effecting a deep penetration of the indicia into the syringe member." The methods available were many and various.

There are also included in the brochure of prior art references the following patents: the patent to Wappner, 2,622,443, issued on December 23, 1952; the patent to Patai, No. 2,647,068, issued on July 28, 1953; and the patent to Becton, No. 2,699,670, issued on January 18, 1955. These patents may not be regarded as anticipatory; while it is true they issued on applications filed earlier than the application on which the patent in suit issued, the cited patents issued after the patent in suit issued. It is well established that a patent speaks as an anticipation from the date of its issue and not from the date of the application. Camp Bros. & Co. v. Portable Wagon, etc., Co., 7 Cir., 251 F. 603, 607; Perfection Disappearing Bed Co. v. Murphy Wall Bed Co., 9 Cir., 266 F. 698, 700; Old Town Ribbon and Carbon Co. v.

Columbia R. & C. Mfg. Co., 2 Cir., 159 F.2d 379, 381. The case of Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651, cited by the defendants, is not applicable. There the issue was priority of invention; it was interposed by way of defense that the patentee was not the original and first inventor. The references were clearly relevant in that case.

### Invention.

The claim to invention here rests upon a rather narrow ground, to wit, the substitution of the volume indicia produced by metallic stain process for the etched or engraved volume indicia of the earlier syringe. There can be no doubt that this substitution improved the syringe; the new syringe possessed advantages not present in the earlier syringe. The question is whether or not the concept was such an advance over the prior art as to attain the dignity of invention. We are of the opinion that it was not. The patentees demonstrated creative imagination but not inventive ingenuity.

The process recommended by the specifications of the patent was clearly old in the art and was so recognized by the patentees. The advance over the prior art, if any, was nothing more than the application of the metallic stain process to another article of manufacture, to wit, the hypodermic syringe. We are of the opinion that this adaptation called for nothing more than the creative imagination of the artisan skilled in the manufacture of glass syringes. The discovery that the metallic stain process of the glass industry could be employed to produce the volume indicia, an element of the earlier syringe, was not a patentable discovery. The prior art clearly disclosed not only the utility of a metallic stain process but also its adaptability to many uses. The argument that the patentees were the first to employ the process in the manufacture of a precision instrument is not persuasive.

■■ It is well established that the adaptation of an old process to a new use, clearly indicated by the prior art, is not invention. Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Celite Corp. v. Dicalite Co., 9 Cir., 96 F.2d 242; United States Rubber Co. v. Sydney Blumenthal & Co., 2 Cir., 98 F.2d 767; Globe Oil & Refining Co. v. Sinclair Refining Co., 3 Cir., 103 F.2d 95; Dorr Co. Inc. v. Yabucoa Sugar Co., 1 Cir., 119 F.2d 521; Goodman v. Paul E. Hawkinson Co., 9 Cir., 120 F.2d 167; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669. The rule is applicable even though particular adaptation is not disclosed by the prior art. The adaptation of either a process or a structure to a new use in a remote industrial field may rise to the dignity of invention if an original and useful result, not theretofore conceived, is accomplished. We are of the opinion that the contribution of the patentees, however, does not meet this standard.

### Anticipation.

The defendants have offered as prior art a glass beaker which has been manufactured and sold by the Corning Glass Works since August 15, 1938, if not prior thereto. (The beaker is marked as Exhibit D-1 in this proceeding, and as Defendant's Exhibit 6 in the deposition of Joseph S. Knapp, an employee of the Corning Glass Works). The exhibit has been in the possession of the witness Knapp since 1939. It appears from the evidence, Exhibit D-14, that a similar beaker was offered for public sale as early as August 15, 1938; the beaker is depicted in a catalogue issued by the Corning Glass Works. We are of the opinion that this reference, standing alone, is sufficient to support the defense of anticipation.

The beaker may be described as a glass vessel on which there is disposed on its outer surface a volume indicia produced by the metallic stain process known in the glass industry. It appears from the "Process Specifications" of the Corning Glass Works that there are three steps employed in the application of the indicia to the vessel: first, the glass vessel is treated with a red stain, composed of a copper salt, applied through an appropri-

ate screen on which the volume indicia is patterned; second, after the application of the metallic salt the vessel is fired in a suitable kiln; and third, the vessel is then cooled and cleaned. The process follows substantially the known teachings of the prior art. The process recommended by the patentees in their specifications, supra, is identical.

The plaintiff argues that the reference is not pertinent because the described vessel is not a precision instrument. We are not convinced by the argument because it seems reasonably clear that the skilled artisan, possessed of a knowledge of the art, could prepare, as did the patentees, a suitable precision screen. The key to the utilization of the metallic salt process in the manufacture of a precision instrument is in the employment of a proper screen on which the volume indicia is delineated with precision. There is no suggestion here that the preparation of such a screen required inventive ingenuity; in fact, it must be admitted that the preparation of such a screen required nothing more than the skill of the mechanic.

### Commercial Success.

The plaintiff relies rather heavily on the contention that the hypodermic syringe of the patent achieved immediate commercial success. The evidence offered in support of the contention is far from satisfactory. There is no evidence, for example, that the hypodermic syringe of the patent supplanted the earlier syringe in the open market nor is there any evidence that the plaintiff enjoyed a substantial increase in its sales volume. Where commercial success is relied on, as here, such evidence is ordinarily produced.

■ We shall assume, however, for the purposes of discussion, that the hypodermic syringe of the patent achieved a degree of commercial success. Evidence of commercial success, although persuasive in doubtful cases, will not overcome the obvious lack of patentable invention. The lack of patentable invention is beyond doubt in the instant case, at least in the mind of the Court,

and therefore the commercial success doctrine would seem to have no application.

### Infringement.

The defendant Omega Precision Medical Instrument Co., manufactures and sells a hypodermic syringe comprised of three elements: first, a glass barrel of the usual type; second, a glass plunger slidably disposed within the said barrel; and third, a volume indicia produced by the metallic salt process precisely positioned along the outer surface of the barrel. It clearly appears from the testimony of Seymour Blackman, president of the said Company, that the metallic salt process is utilized in the application of the volume indicia; the metallic salt preparation is applied to the glass surface of the barrel in the manner recommended by the specifications of the patent in suit. The hypodermic syringe manufactured and sold by the said defendant infringes claims 3 and 6 of the patent in suit if the patent in suit is held to be valid.

The defendant Comar Glass Corporation manufactures and sells a hypodermic syringe comprised of three elements: first, a glass barrel of the usual type; second, a glass plunger slidably disposed within the said barrel; and third, a volume indicia which is flush with the glass surface of the barrel. It appears from an examination of the syringe (Exhibit P-3) that the volume indicia has been applied by the metallic salt process; the calibrations are flush with the glass surface of the barrel and appear to be fused with the glass. This conclusion is supported by the testimony of one Philip G. Hilbert, a patent attorney and qualified chemist, called as a witness by the plaintiff. It may be reasonably inferred, particularly in the absence of any testimony to the contrary, that the hypodermic syringe manufactured and sold by this defendant is an infringement of the claims in suit.

### Conclusions.

#### I.

The Court has jurisdiction of the subject matter and the parties.

## II.

 The claims in suit are invalid because of anticipation by and lack of invention over the prior art.

## III.

The claims in suit, if valid, are infringed by the hypodermic syringe manufactured and sold by the defendant Omega Precision Medical Instrument Co., Inc.

## IV.

The claims in suit, if valid, are infringed by the hypodermic syringe manufactured and sold by the defendant Comar Glass Corporation.

## V.

Judgments in favor of the defendants, consistent with this opinion, may be entered.

*Note:* The facts and conclusions herein stated shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.