## DAVIS-BOURNONVILLE CO. v. ALEXANDER MILBURN CO.

(District Court, S. D. New York.  January 8, 1924.)

1. **Patents ⚙══36—Device displacing other similar devices favored by court.**

A patent for a device which displaced all other similar devices and which seems likely to be the final form, even if patentees at the time did not recognize the full value of their invention, *held* entitled to much favor from the court.

2. **Patents ⚙══167(1)—Specifications for cutting torch held to disclose requirement for series of holes for heating gas.**

Specifications of a patent for an oxy-acetylene torch for cutting metals, bringing the heating gas to the work in a "plurality of streams," though not limited to a series completely encircling the oxygen jet, *held* to sufficiently disclose an intention to have the oxygen jet surrounded for a substantial arc with the combustion holes.

3. **Patents ⚙══167(2)—Drawings admissible to clear up ambiguities in details of specifications.**

Though drawings may not be used to supply an element altogether lacking from the specifications, they are admissible to clear up details in the specifications which are ambiguous.

4. **Patents ⚙══328—874,666, covering tip for oxy-acetylene torch for cutting metals, held valid and infringed.**

Patent No. 874,666, for an oxy-acetylene torch for cutting metals by bringing the two gases in a mixture to the work in a circle of pencil-like flames encircling the oxygen flame, which burns the superheated metal and produces the cut, *held* valid and infringed.

5. **Patents ⚙══328—No. 1,028,410, claims 3, 6, 7, for supporting head for oxy-acetylene torch, held valid.**

Claims 3, 6, 7, patent No. 1,028,410, for an oxy-acetylene torch to cut metals, covering a supporting head into which can be inserted interchangeable unitary tips to obtain changes in the proportions of the mixture in the gases and in the relation of mixture to cutting jet, *held* valid.

6. **Patents ⚙══24, 26(1)—Not a rule of general application that making into two what was single, or vice versa, is not invention.**

It is not a rule of general application that there can be no invention in making into two parts what was single, and vice versa, and it is often an invention of considerable merit to combine into one what every one theretofore thought must be two.

7. **Patents ⚙══68—Prior invention found in fundamental idea of invention rather than in disclosure.**

A prior application is not a prior publication. It is relevant only on the issue of prior invention. In deciding that issue regard should be had primarily to the claims of the two applications, as in cases of interference. However, if the fundamental idea of the prior application is the same, a strict similarity of claims is not essential to establish prior invention.

8. **Patents ⚙══70—Under statute "invention" out of published disclosures will not support patent.**

Under Rev. St. § 4886 (Comp. St. § 9430), throwing into the public domain all disclosures once published, though it is possible to make a new

---

⚙══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

invention out of such disclosures by selecting new and useful combinations, which no one has heretofore observed, such invention will not support a patent, because the statute requires that the description of the machine, process, or composition embodying the patented invention shall not itself have been previously published.

9. **Patents** ☞328—880,099, for welding torch, held invalid for anticipation.
Patent No. 880,099, for a welding torch, providing for an interchangeable tip in which the gases are mixed, *held* invalid for anticipation.

In Equity. Suit by the Davis-Bournonville Company against the Alexander Milburn Company for infringement of patents. Decree for plaintiff for part only of the relief sought.

On final hearing of the usual bill in equity for infringement of patents 874,666, 1,028,410, and 880,099. All these patents relate to the art of oxy-acetylene torches; the first two for cutting metals, and the second for welding. The first provided for bringing the two gases in a mixture to the work in a circle or arc of pencil-like flames. In the center was the oxygen flame, which burns the superheated metal and thus produces the cut. The patent presupposed the general art and was limited to the form of tip disclosed.

The second patent was for a supporting head in such a torch, into which could be inserted interchangeable unitary tips. In the progress of such work, it is often desirable to change the proportions of the mixture and the relation of mixture to cutting jet. This can be done by changes in the size of the bores or ducts in the tip. The patent is for such tips in combination with a single head.

The third patent is for a welding torch; that is, one in which the cutting jet is absent. It bore a similar relation to the welding art that the second patent bore to the cutting art; that is, it provided for an interchangeable tip in which the gases might be mixed, the mixture dependent upon the caliber of the ducts.

Dean S. Edmonds, of New York City, for plaintiff.
James A. Watson, of Washington, D. C., for defendant.

## Patent 874,666.

LEARNED HAND, District Judge. [1] This patent was applied for on April 5, 1907, when the art was in its infancy. It is reasonably clear that the patentees at the time did not recognize the full value of their invention, but the fact remains, whether they did or not, that they happened upon a device which became the accepted form, which has displaced all others, and which seems likely to be the final tool by which metals will be cut under this process. As such the patent is entitled to much favor from a court, especially as it appears that for nearly its whole life it has secured the substantial acquiescence of the trade. The nature of the attack upon it confirms the impression which these considerations suggest.

[2] The defendant's first complaint is that the invention is not disclosed, because the specifications do not definitely show that there must be a series of holes for the combustible gas. It is quite true that the patentees did not limit their invention to such a series completely encircling the oxygen jet, and in so doing they betrayed their incomplete knowledge of what later experience has disclosed. On the other hand, they showed beyond question that they meant to have the oxygen jet surrounded for a substantial arc anyway with combustion holes, and that this was the sole purpose of their invention,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

distinguishing it on the one hand from Manne, who had a ring of flame, and from Jottrand, who had a single flame in advance. That there were advantages in this as against either extreme, time has amply proved.

It would scarcely seem necessary to go over the text of the patent to prove that this was in fact the disclosure, were it not for the insistence of the defendant. The patent leads off (page 1, lines 13–15) with a statement that the invention consists of bringing to the work the heating gas "in a plurality of streams." Again (lines 25–29), that the heating gas is led to the metal "in several independent streams * * * to bring about a more intense heating." The diagrams show at the least three holes for heating, and the specifications always speak of the heating holes in the plural. Indeed, there is not the faintest color for a contrary supposition, except that at one place (page 1, lines 42, 43) the patentees speak of the possibility of "leading the combustible only at one of the gas outlets." That the tool may be so used is true enough, but the patent is not for a process, but for a mechanical device, and the patentee in this passage merely shows how it is possible, if desired, to use the tool in the ways of the prior art.

[3] The next attack depends upon the fact that the examiner required the patentee to insert in all his claims a limitation that the heating outlets and the cutting outlet must be parallel. The specifications refer to these outlets, but nowhere describe them as parallel, though the drawings clearly show them to be such. The defendant argues that one may not look to the drawings to supply a defect in the specifications. Gunn v. Savage (C. C.) 30 Fed. 366; Windle v. Parks & Woolson Mach. Co., 134 Fed. 381, 67 C. C. A. 363; Fulton Co. v. Powers Regulator Co. (C. C. A.) 263 Fed. 578, 581; George Cutter Co. v. Metropolitan etc. Co. (C. C. A.) 275 Fed. 158, 162. If so, he says, there is an element in the claim which is not found in the specifications and the disclosure is void. Since the limitation is so simple that the mere statement of it is enough, it is obvious that there could not be a more technical and formal objection to a meritorious invention.

There are, however, two answers, each complete. The first is that the rule in question has never gone further than to refuse to allow diagrams to supply an element altogether lacking from the specifications; and, second, that the parallelism is not a feature of the specifications at all, but merely a limitation imposed upon the claim. All the cases cited, except the last, recognize that the drawings are admissible to clear up any details of the specifications which are ambiguous. The last case cited does not dispute this rule. In the case at bar the relative direction of the outlets is not specified, but they are merely mentioned, since it was scarcely necessary to describe them at all. One must look to the drawings for a definite understanding of how the tool is to be organized in this regard; but, since all the features are mentioned and described generally, one has the right to do so. If it were essential to the practice of the invention, which it is not, that the outlets should be parallel, the drawings might therefore be resorted to to show their direction and shape.

But the whole argument misconceives the action of the Examiner and the patentee. The parallelism of the outlets was not a necessary element to the disclosure. Indeed, Murphy's patent, on which the original claims were rejected, showed converging outlets. Perhaps the best tool will not be so made, but there is no reason whatever to say that, if the outlets are not parallel, the torch will not cut. Thus the detail added was in no sense a necessary part of the disclosure. All that happened was that the Examiner refused to allow the claims as broadly as the disclosure would have justified. That does not make a patent void, of course, and the patentees quite sensibly agreed to the limitation, because the claims still gave them all that they really wanted.

[4] There is no relevant prior art but Menne and Jottrand, from each of which the patentees diverged. If it was an easy step from either to the patent in suit, it is curious that the art did not at once see it. The fact is that it took considerable experience, and knowledge to see that in metal cutting it was necessary to "preheat" an area considerably larger than the cut, in order to get the metal to the requisite temperature for actual combustion. Indeed, Menne's machine was not a cutter at all, though in view of Linde Air Products Co. v. Morse Dry Dock Co., 246 Fed. 834, 159 C. C. A. 136, it should be regarded as a relevant reference. Still one cannot make proper cuts with a heating ring, and the division of such a ring into 6 to 8 small flames was as much an invention as to multiply Jottrand's single flame.

The patent is not, indeed, a pioneer, but it was apparently final, and stabilized the cutting torch. I cannot see on what theory it can be declared invalid. The plaintiff may take the usual decree on claim 1.

## Patent 1,028,410.

[5] There is no doubt as to the infringement of this patent, and that issue requires no discussion. The defendant's tip has merely flattened the cone of the patent upon itself into a flat surface, and the claims in suit, Nos. 3, 6, and 7, read upon it literally, as well as functionally. Thus the case turns upon validity. There can be no pretense for claiming a broad invention; the disclosure is important only because it enabled a quick change of tip for variations in the necessities of the work. Yet there is no reason why, so far as it went, it should not be protected. The defendant's position depends upon two classes of anticipations: First, those which issued before Whitford filed his original application, March 4, 1911; and, second, those which were filed before that date, but had not issued till later.

In the first class there is strictly only Bruckner, 935,458. This torch was not a cutter at all, but a welder, and the invention was primarily to allow the angle between the handle and the head, with its tip, to be varied, so as to accommodate itself to difficult corners of the work. I agree that, so far as Whitford's disclosure was a welder, this would be a complete anticipation. The tip is unitary; in Figure 5 and Figure 3 (vide page 2, lines 4–6) the two gases are led into a common duct, which forms a mixing chamber in an almost identical way with Whitford's. They do not mix until they reach

that duct, and their proportion could be controlled by the caliber of the ducts. What, then, it may be asked, was there left to do, except to add an independent duct for the cutting jet and connect it properly to a source? There was, indeed, nothing more to do, and for that matter nothing to do after the welder patent in suit, 880,099, but to add a cutting jet and make it integral with the tip. Yet, though the patent to Rodrigues-Ely, 880,099, was issued in 1908, application was not made for the patent in suit till 1911. Even if there are no great mechanical obstacles of design, once you wanted a unitary tip, the idea had never before appeared in the art, which had proceeded by the awkward expedient of bringing the cutting jet to the work in an independent tip with a separate pipe. The added convenience of the combination was very considerable.

The defendant tried to prove a prior use of the invention in suit by one Wright. The evidence is not clear as to when Wright sold the torches which are disclosed in Figures 4 and 5 of his patent, as exemplified in Exhibits B[1] and A[1], respectively. The documents offered in support of his testimony, Exhibits C[1] and D[1], do not identify the kind of torches to which they refer, and Exhibit D[1] in February, 1911, refers to work still experimental. It is, of course, possible that Wright may have marketed some of his torches between the date of his application, January 27, 1911, and Whitford's original application, on March 4, 1911, and perhaps it is not unlikely that he did so before January 31, 1912, the date of the divided application. But, as it is the date of the original application which counts, the proof is insufficient to show beyond doubt that his torches were on sale or in public use before that time. Thus on any showing Wright's patent would have to stand only as an earlier application.

However, I regard Wright's whole invention as irrelevant, because the disclosure is not the same. He led his two heating gases into an aperture in the head where the mixing began. The tip fitted into this aperture, but did not wholly fill it, and there were but two ducts in the tip, instead of three, as in Whitford, Reich, and Clifford. Obviously this did not allow for variation in the composition of the heating mixture by mere changes in the tip. The ducts in the head being necessarily constant in bore, the deliveries of oxygen and acetylene, given the pressures, must be always the same, and the mixture could be changed only by changes of pressure. In Whitford the ducts for oxygen and acetylene were in the tip, and the mixing did not begin outside it. Thus the quality of the heating mixture can be made to vary by differences in their relative bores; that is, by the substitution of a tip in which the bores varied. This was what the art wanted, contributing, as it did, very markedly to the convenience of the operator, who had only to substitute the proper tip when he wanted a different mixture.

In the second class, i. e., those pending when Whitford's application was filed, there are three relevant patents, Brousseau, 992,156, Clifford, 1,018,613, and Reich, 1,097,203. Strictly speaking, all are alike in point of law, but Brousseau, viewed only as disclosure, does not seem to me to anticipate, and I shall therefore consider it sepa-

rately as though it were part of the prior art. It was a cutting torch, unlike Bruckner, and, save for a detail which I shall mention in a moment, it would anticipate. That detail is that the tip was divided in two. The tip proper contained only two ducts, that for the cutting jet, and that for the mixed combustible. Above the tip was a cylindrical member, *12*, in which there were three inlets, one for the cutting jet, and two for the two combustible gases, which began their mixture in the member itself. It is quite likely that the reason why Brousseau did not incorporate this member into the tip was that he inserted in the mixing chamber a curious conical member *32*, designed to secure a more intimate mixture. This it would have been impossible to do, if the tip had not been in two pieces.

[6] However, the tip as it stands is not single, and is incapable of the advantages of the plaintiff's and defendant's device. It is, indeed, sometimes said that there can be no invention in making into two parts what was single, or vice versa. So far as such statements explain any given situation, they are very well; but they should not be taken as positive rules of general application. It is often an invention of considerable merit to combine into one part what every one had theretofore thought must be in two. In the case at bar it is certain that Brousseau's torch was not fitted as a universal head for interchangeable tips, and that it required the suggestion from some one else to make it so. It is true that once one thought of it, there was not much trouble in making the changes, but that is often so. Experience might show that it was unnecessary to adopt Brousseau's awkward member, *32*, and that the remaining two parts might be consolidated, but that experience was apparently not yet at hand. Regardless of the fact, therefore, that his application was pending with Whitford's, I see no reason to treat his disclosure as an anticipation.

In the second class, the patents to Reich, 1,097,203, and Clifford, 1,016,613, are, however, quite different from Brousseau and the plaintiff cannot escape them as disclosures. Clifford would certainly have anticipated, and I understand that the plaintiff does not dispute it. Reich's disclosure is equally good, and, indeed, the only challenge to it is that it would be inoperative. That is, however, something which I have no right to assume. Certainly the flash-back valve is not a part of claims 2 and 3 of that patent. They might be practised after omitting the valve, which required no ingenuity. The valve was the only thing which could by any chance be thought to make the disclosure inoperable. On the other hand, none of their claims conflict with the claims in suit. Upon the same disclosure, or, more accurately, upon a disclosure which could support Whitford's claims, these earlier inventors sought and obtained claims made up of different combinations from those claimed by Whitford.

[7] The question is therefore squarely presented whether on the issue of prior invention it is the claims or the disclosure which counts. That question is unfortunately left in much confusion in the cases. On principle it would seem that the claims were the place to look for the "invention." The disclosure, so far as it is only a description of the machine, process, or composition, is certainly not the invention

proper. It does not tell which of the various elements disclosed the patentee selects as the combination which it will be profitable to follow. Without some such selection, the art is left without cue for omission, and must reproduce the whole disclosure in all its details. The claims alone give any scope to the invention, and some scope is essential to its value. It would seem that the "invention" must lie in the act of selecting out of the possible combinations which will read upon the disclosure such as are new and useful. Leonard, Inc., v. Maxwell, etc., Co., 252 Fed. 584, 593, 164 C. C. A. 500 (C. C. A. 2).

Therefore, at least a priori, the "invention" must be found in the claims, and in the claims alone, as was said categorically by Hough, J., in the District Court in Leonard, Inc., v. Maxwell, etc., Co., 288 Fed. 62, 67. Indeed, that in my judgment is the strict theory, though some latitude is given in its application, as I shall hope to show. If so, when the issue arises of prior invention between two persons, whether it be on interference or when raised by an infringer, it should be decided only by a comparison of the claims; i. e., of that part of the patent or application which sets out what combinations of the elements disclosed the applicant says are his new and useful contributions to the art. That appears to me to be the meaning of Sundh v. Interborough, etc., Co., 198 Fed. 94, 117 C. C. A. 280 (C. C. A. 2).

[8] It may be argued that, if so, then logically it ought to be possible to make new "inventions" out of published disclosures, which Revised Statutes, § 4886 (Comp. St. § 9430), forbids. I reply that section 4886 does not attempt to define what are "inventions," but ex proprio vigore throws into the public domain all disclosures once published. It is, indeed, possible to make new "inventions" out of such disclosures, selecting new and useful combinations from their elements which no one has hitherto observed. The reason such "inventions" will not support a patent is not because they are not "inventions," but merely because the statute requires as a condition that the description of the machine, process, or composition in which the patented "invention" is embodied shall not itself have been published before. That is quite another matter from saying that there is no new "invention," and the confusion of the two has caused much uncertainty.

Therefore, if a disclosure is not published, the question of prior "invention" ought to depend altogether upon whether the claims of the patent in suit are themselves new, and in the case at bar neither Reich nor Clifford can be set up as prior inventors.. In deciding this question Revised Statutes, § 4920 (Comp. St. § 9466), ought not to be considered at all; it is a mere rule of pleading, drawn from the analogy of those rules of the common law which required notice of evidence to be given under the general issue. Its incorporation into a statute is unfortunate, because it has led to the supposition that it added something to the definition of the conditions on which a patent might issue as contained in section 4886.

The matter is not, however, as clear as the foregoing would make it, which I have purposely oversimplified. For example, when the question is of double patenting, which is another aspect of precisely

the same thing, it is not enough that the claims differ. Miller v. Eagle, etc., Co., 151 U. S. 186, 195–202, 14 Sup. Ct. 310, 38 L. Ed. 121. The term "invention" covers more than the claims, and how much more is very vague. Again, under Revised Statutes, § 4916 (Comp. St. § 9461), the reissue section, it must appear that the matter added must be part of the same "invention." Obviously, if the "invention" lay only in the claims, the claims could not be substantially changed; i. e., no new claims could be added for different combinations of the elements disclosed, not even if they were for species of the genus already claimed.

It is apparent, therefore, that the law has not developed with such nice logical precision as is implied in what I have said. For example, in Hillard v. Fisher, etc., Co., 159 Fed. 439, 86 C. C. A. 469 (C. C. A. 2), the court decided the case upon a comparison of the disclosures, and in Otis Elevator Co. v. Interborough, etc., Co., 222 Fed. 501, 138 C. C. A. 97 (C. C. A. 2), upon the priority of discovery. All that was decided in Vacuum, etc., Co. v. Dunn, 209 Fed. 219, 126 C. C. A. 313 (C. C. A. 2), was that a pending application was not a part of the prior art.

In Diamond, etc., Co. v. Kelly Bros. (No. 1) 120 Fed. 282 (C. C.), Judge Archbald distinguished between the effect of an earlier application as disclosure and as proof of prior invention, though he did not say how they were to be distinguished.

Formers', etc., Co. v. Beaver, etc., Co., 236 Fed. 731, 150 C. C. A. 63 (C. C. A. 7), turned upon a comparison between the claims of patents copending with the patent in suit, though the case is not wholly clear. It cited Sundh v. Interborough, etc., Co., supra, and (very curiously) Barnes, etc., Co. v. Walworth, etc., Co., 60 Fed. 605, 9 C. C. A. 154 (C. C. A. 7). I say "very curiously," because Barnes, etc., Co. v. Walworth, etc., Co., supra, held nothing of the kind, but apparently that the disclosure is what counts on the issue of prior invention, thus making the difference between the third and fourth defenses of section 4920 only one of form.

In Camp Bros. & Co. v. Portable etc. Co., 251 Fed. 603, 163 C. C. A. 597 (C. C. A. 7), the court considered a pending application as relevant on the issue of prior invention only by virtue of the claims. It is true that the case does not lay down the rule in general terms, but there seems to be no doubt that it meant to follow Sundh v. Interborough, etc., Co., supra.

In Willard v. Union Tool Co., 253 Fed. 48, 166 C. C. A. 646 (C. C. A. 9), the patent in suit was later in application than another patent to one Griffin. Griffin's patent had claims like those in suit except for one element. The resulting divergence did not, in the court's opinion, prevent Griffin from being the earlier inventor, because he "had the conception of all the claims," as might be gathered from reading the disclosure as a whole. Hence the decision turned upon priority by proof dehors the applications. Clearly the claims were not treated as the sole measure of the "invention."

In the Sixth circuit it has been established by an unusual number of cases that copending applications count precisely as though they were part of the prior art. The comparison on the issue of prior

invention is of the disclosures. This has been the rule for over 30 years, as established in the following cases: Cochren v. Zimmerman, 53 Fed. 801 (C. C.); Drewson v. Hartje Paper Manufacturing Co., 131 Fed. 734, 65 C. C. A. 548; Electric, etc., Co. v. Westinghouse, etc., Co., 171 Fed. 83, 96 C. C. A. 187; Lemley v. Dobson-Evans Co., 243 Fed. 391, 156 C. C. A. 171; Jackson Co. v. Adler, 243 Fed. 386, 156 C. C. A. 166; Twentieth Century Co. v. Loew Co., 243 Fed. 373, 156 C. C. A. 153; Diamond Power Specialty Co. v. Merz Capsule Co., 276 Fed. 274 (C. C. A.); Concrete Appliances Co. v. Meinken, 262 Fed. 958 (C. C. A.); Gen. Electric Co. v. Cooper Hewitt Co., 249 Fed. 61, 161 C. C. A. 121.

Finally, in Westinghouse, etc., Co. v. Metropolitan, etc., Co., 290 Fed. 661 (C. C. A. 2), it was held that new claims introduced into an application while in the Patent Office did not require any supplemental oath, if the disclosure was unaltered in essentials. This was on the theory that:

"What any patentee has invented is theoretically what he discloses, and the disclosure is the specification. A claim is a definition of that which has been described in the specification."

Certainly this is inconsistent with the notion that the "invention" resides solely in the claims. Any conclusion amid the confusion of the cases is very doubtful. It appears to me that on the one hand the disclosure qua description is not the "invention," and that it certainly cannot be enough that the claims of the patent in suit read upon the description of a copending application. On the other hand, it would seem that it is too extreme a doctrine to say that the "inventions" are necessarily different because they contain claims made up of different elements. As in so many other instances, the ultimate question is one of degree; that is, how far removed are the purposes of the earlier inventor from those of the patentee. If they contain a combination similar in purpose—if, to use a vague phrase, they contain the fundamental idea of the patent in suit—it is not enough to save the latter that the claims are not the same. This is the rule in cases of double patenting and of reissues. No doubt it causes much litigation, and is not as satisfactory as a nicely exact rule. But in such matters the law seeks, even at the expense of certainty, to follow the crude standards of common sense.

In considering Reich and Clifford, I think that I must therefore go beyond a bare comparison of the claims; but still I cannot treat them as if they were in the prior art. I must see whether within their patents there can be found any purpose to contribute to the art the combination of an interchangeable single tip containing three ducts and a mixing chamber, and available for use in a single head. That must appear as one of the objects of the invention, in the sense that it would have supported a reissue, and would not have allowed a second patent. Especially in this aspect it is relevant to consider the inducements of the patent, where the patentee sets out in general terms what he considers to be the benefits which he contributes to the art. So considered, neither patent is for the same "invention" as Whitford's.

Reich states the objects of his invention on page 1, lines 9–47, of his disclosure, and nowhere suggests anything like Whitford's. They are to prevent "back flashes," to provide a combined blowpipe and cutter, to make the nozzle movable, so as to reach inaccessible spots, and to cool the nozzle. The claims follow this declaration of his purposes. All the claims, except 2 and 3, are for a combination containing the "back-flash check valve." Claims 6 and 7 have, it is true, a "mixing passage" in the tip, but do not contain any cutting jet. Claim 2 contains the element of an angular rotatable tip, and no cutting jet. Claim 3 is for a double clamping means, and would not read on the disclosure of the patent in suit. Reich nowhere showed any purpose to select the combination of elements which Whitford claimed.

Clifford's objects (page 1, lines 13–28) were to allow the angle of the tip and head to be changed, to improve the mixture of his gases by a vortex movement, to separate, if need be, the cutting from the welding tip, and to provide against "back flashes." His claims bear out these purposes. Claims 1 and 7 were for pivotal changes between the handle and what he called the "burner support." There was no requirement that the mixing chamber should be in the tip. Claims 2 and 3 were for the pivotal mounting, combined with removability for the cutting tip, which was a separate piece. Claim 4 was for a peculiar mounting of the two tips. Claim 5 was for the mixing plug, and claim 6 for an asbestos or gauze packing (page 2, lines 85–88), designed to prevent "back flashes." In none of these, any more than in Reich's application, is any intimation to be found of what Whitford claimed.

Therefore I find that neither of these was a prior "inventor" to Whitford. There is no injustice in this result. While they might have added such claims to their application, they did not. To perceive the utility of Whitford's combinations and to set them forth would have benefited the art, which without such cues must reach them by the aid of its own ingenuity. So long as the disclosure was not for all purposes dedicated to the public, there is no reason why another, who independently observes beneficent combinations, should not be entitled to profit by his ingenuity. He has contributed something which the public might or might not have learned alone; never, except by some independent exercise of an originality which was apparently outside the compass of the routine artisan. The plaintiff may take a decree upon the claims of this patent.

## Patent 880,099.

[9] This patent is for a welding torch, and discloses a unitary tip in which the gases are mixed, in part by means of the sucking action of the oxygen, which is assumed to be under a higher pressure than the combustible. The claims in suit, 2 and 3, each speak of the purpose for which the tip is to be used. Claim 2 says that the patent is for "an apparatus for heating and welding metals by means of gases having separate conduits for the two kinds of gases under different degrees of pressure." Claim 3 has in substance the same language. It is probable, although not certain, that the defendant in

practice uses its torch with pressures as nearly as possible equal. However, I cannot think that question relevant. The claims are for a tip made as the disclosure described and containing the features selected. If it may be used for gases at equal pressures, it is no less an infringement, though the patentee assumed that the pressures would be unequal. Infringement does not depend upon the way the torch is used and seems to me to have been shown.

The defendant's best reference against this patent is the French patent, 363,119, to Eugene Odam, published July 21, 1906, and therefore a part of the prior art when the patent in suit was applied for. This was for a welding torch, to be used for the same purposes as the patent. It contained a central duct for the oxygen jet and side ducts for the combustible, to be admitted through oblique passages, $k$, $k$, from which the combustible was to be sucked as by an injector, just as was shown in Figure 2 of the patent in suit (page 2, lines 4–6). "This jet of air or oxygen aspirates (produit l'aspiration) the combustible gas by the ducts $k$, $k$." Thus the operation was the same, and the purpose was the same, because at the outset of his specifications Odam says that his invention—

"has for its object a mounting for a tip especially made so as to be able to receive interchangeable tips capable of functioning with different combustible gases, whether or not under pressure."

The plaintiff objects to the sufficiency of this disclosure because the seal would be imperfect, thus allowing the mixture of gases before they reached the passage, $h$, and because in use the conduits, $k$, $k$, would change in bore and thus disturb the proper proportion between oxygen and acetylene. Properly to consider these objections I must take up the specifications and diagrams in some detail. It is in the first place clear that Odam presupposed a gas seal. Thus on lines 20–27 of page 1 the patent reads:

"The cylinder, $A$, at $c$, shows a threaded part, on which a packing ring, $C$, is designed to be screwed, which serves to hold the tip, when inserted into the cylinder, $A$, insuring a suitable hermetic seal (herméticité) between the body of the tip and the body, $A$, of the cylinder."

It may be argued that this seal was intended only to prevent the escape of the combustible along the side of the tip. Perhaps it was; yet the inevitable effect of screwing down the packing ring, $C$, would be to transfer the pressure to the shoulder, $N$, of the tip through an unlettered ring, and thence to the end of the tip, where it abuts upon the shoulder, $d$, at the rear of the cylinder. If properly machined, this would make the same gas seal as the defendant's tip, and by just the same means.

It appears illegitimate to criticize this part of the disclosure on the ground that the seal might be imperfect. Rather it must be supposed that the apparatus would be made by competent persons, who understood the necessary conditions of good workmanship. The packing ring must be supposed to insure a suitable seal, where a seal was necessary. It was pre-eminently so at the end of the tip, and even if the intention was also to prevent leaks of the combustible, that should not detract from its primary effect. Indeed, it was apparently on

the washer, $O$, between the shoulder, $m$, and the unlettered ring that Odam counted (page 1, lines 55–57), to prevent the escape of the combustible.

As to the possible disturbance of the combustible ducts, $k$, $k$, the argument is that by screwing and unscrewing the plug, $F$, which is inserted in the threaded recess, $e$, the plug would itself turn in the tip, $E$, and change the bore of the ducts. But, the patentee himself says (page 1, lines 51–54), that the threading of the extended part of the plug, $F$, and its insertion into the threaded recess, $e$, is not an essential part of his disclosure. I should have thought it so, had he not said it, but his language is clear on that detail. Thus he says in the passage in question:

"Moreover, resort may be had to any other means of mounting thus to fix the tip at the end of the cylinder, $A$, of the mounting."

The word used is "fixer," and is translated "attach," "secure," and "fix." I have chosen "fix," because I think the purpose was to carry the duct, $p$, to the open chamber in front of the nut, $D$. If the shoulder, $d$, had extended across the whole end of the mounting, it would be difficult to insure the registry of the duct, $p$, with some corresponding duct in the shoulder. The extended end of the plug, $F$, at once insured the alignment of the tip as a whole, and avoided any danger as to registry. But it was in no sense necessary that it should be threaded, and the patentee said so.

If, therefore, it proved in practice troublesome to thread both the plug and the recess, $e$, it seems to me the most obvious detail to omit that feature. The seal at the shoulder, $d$, being as adequate as the defendant's, I cannot see why Odam was not a complete anticipation, if the defendant's tip be an infringement. Odam's summary at the close, the equivalent I suppose of our "claim," is a complete description of the patent in suit. The phrase, "un chalumeau qui est maintenu at assujetti par un presse-étoupe," is variously translated "secured," retained," and "held and made tight." The last is clearly the right translation, since it alone gives any effect to "assujetti," a stronger word than "secured," and in colloquial French the equivalent of our "subjected."

Therefore I find patent 880,099, invalid for anticipation. The plaintiff may take a decree upon the first two patents; the defendant upon the last. There will be no costs.