## GRISCOM–RUSSELL CO. v. WESTING-HOUSE ELECTRIC & MFG. CO.

### No. 7501.

Circuit Court of Appeals, Third Circuit.

June 19, 1941.

W. Brown Morton, of New York City (Wm. Steell Jackson & Son, of Philadelphia, Pa., and W. B. Morton, Jr., of New York City, on the brief), for appellant.

Drury W. Cooper, Sr., of New York City (Synnestvedt & Lechner, of Philadelphia, Pa., Victor S. Beam, of New York City, A. B. Reavis, of Lester, Pa., and Drury W. Cooper, Jr., of New York City, on the brief), for appellee.

Before MARIS, CLARK, and JONES, Circuit Judges.

JONES, Circuit Judge.

The plaintiff sued to restrain the alleged infringement of United States Patent No. 1,955,015 issued to one Price and whereof the plaintiff is the assignee. The District Court, finding want of invention, entered judgment dismissing the complaint and awarding costs to the defendant. The question on this appeal, therefore, is whether the patent discloses invention.

Only claim 1 of the patent is in suit,[1] and covers a stationary head for feed-water heaters to be used with high pressure boilers. The plaintiff's invention is said to lie in the combination which he made of certain elements, admittedly known to the art long prior to the patentee's application.

In feed-water heaters, which have been used for low pressure boiler installations for many years, the preheating of the water is accomplished by means of a cylindrical shell into which exhaust or surplus steam is introduced. At one end of the shell, tubes extend into its chamber and then, bent in u-shape, return to the end of the shell. The open ends of the tubes (inlets and outlets) are integral with the shell's end plate, which is called a tube

---

[1] Claim 1 of Price Patent 1,955,015 reads as follows:

"A heat exchanger comprising a head having a chamber therein for receiving fluid under pressure and an opening for providing access to said chamber, a plurality of tubes communicating with said chamber, means for supplying fluid under pressure to said tubes, means within said chamber for causing the fluid to flow through said tubes in a plurality of passes, the said last named means comprising a partition and a partition cover detachably secured to the partition; and a cover plate for the opening in said head, the said cover plate being held against its seat by fluid pressure in said chamber."

sheet. Water flowing through the tubes is thus heated by the steam surrounding the tubes within the chamber formed by the shell.

For the inflow and outflow of water in the tubes there is fastened to the outside of the tube sheet a cylinder or head which is divided longitudinally throughout its length by a partition which serves to separate the inlets of the tubes from the outlets, as well as the water in the head, which enters through an inlet on one side of the head and, after its course through the heating tubes, leaves the outlet on the opposite side of the head. To the end of the cylinder or head, away from the tube sheet, there is fastened a cover plate. This cover plate, which must be removable for the servicing or periodic inspection of the tubes, is kept in place by stay-bolts which clamp the cover externally to the circumference of the head at its outer end. It is essential that the cover plate remain securely fastened at all times (when the heater is in use) not only to prevent external leakage from the head at the cover plate but also to prevent internal leakage through any developing space between the cover plate and the internal partition which bases on the under side of the cover plate at a right angle thereto. Physically (and without taking into consideration the pressure of the boilers into which the heated water is later injected) the pressure of the water at the inlet to the head is slightly greater than at the outlet because of the loss from friction occasioned by the water's passage through the tubes. Due to this difference of pressure, any opening between the end of the partition and the cover plate would cause the in-going water to by-pass the heating tubes and to enter directly the out-go chamber of the head, there to mingle with the heated water and thus reduce its temperature with a resultant loss in boiler efficiency.

As long as low pressure boilers were used, feed-water heaters constructed as above described functioned satisfactorily. Stay-bolts were quite ample to withstand the thrust on the cover plate from the internal pressure. But with the advent of a greater demand for high pressure boiler installations, trouble developed with the cover plate type of feed-water heater. The high pressure within the head would loosen the stay-bolts and unseat or raise the cover plate. Larger and more stay-bolts were used until a practical extreme limit was reached when the working pressure in boiler feed-water heaters had reached 1600 pounds per square inch.

It was in this situation that a company in Milwaukee asked the plaintiff to bid on the construction of boiler feed-water heaters to have a working pressure of 1800 pounds per square inch. The Milwaukee company accompanied its request with drawings for a feed-water heater with a "manhole" covering designed to avoid the numerous stay-bolts and the high tension upon them which had already reached a limit in the cover plate type of feed-water heater. A "manhole" cover for the opening into a pressure vessel utilizes the pressure to push the cover into tighter contact with its seat instead of loosening it. However, pressure-locked cover plates were not feasible for use with partition sealing of the kind in the cover plate type where the partition extends to the cover plate. Space is necessary for inserting the cover plate and rotating it to its position, and the natural and expected movement of a cover sustained in tight position by pressure is away from the partition. To obviate these obstacles to the use of pressure-locked covers in conjunction with the oldtime partition seal, the Milwaukee drawings showed a head in which the partition was integral with the tube sheet and the chamber, that is, a separate head, each with its own "manhole" cover, was provided for each pass. Thus the partition as an individual element was done away with. The plaintiff advised the Milwaukee company that the head shown by their drawings was impracticable because it could not be made as a sound one-piece forging. None the less the Milwaukee company insisted upon a pressure-locked cover and not a bolted cover plate, and it was then that the plaintiff turned the problem over to its chief engineer, Price, who came forward with the apparatus covered by the patent in suit, which the plaintiff claims is invention.

What Price did was to use a "manhole" cover plate for the head and to shorten the partition within the head. To the shortened partition, at the end away from the tube sheet, he fastened an end plate at right angles to the partition and to the side wall of the cylinder on the outlet side. The effect of this was to reduce the compartment, located within the cylinder or head and into which the heated

682

water flows upon leaving the tubes. Thus sufficient room or clearance was gained for the insertion and rotation of the "manhole" cover to position. The cover, being elliptical in shape, is inserted lengthwise through the long dimension of the elliptical opening in the head and then turned to its seated position. The difference in pressure between the inlet and the outlet water in the head, to which we have already referred, serves to sustain in place the independent chamber within the head, formed by the shortened partition and its own end plate.

Admittedly all of the elements of Price's claimed combination were old in the art. The "manhole" type of cover for a pressure vessel (including the elliptical shaped cover) was well known and, as the plaintiff concedes, was "an old expedient for using the pressure to push the cover tight instead of loose". The shortened partition and the relatively smaller internal compartment for the outgoing fluid in the head had been priorly disclosed by the British patent No. 267,225, and with the clarity and definiteness required to constitute it anticipation within the United States. See Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, 1003; Donner v. Sheer Pharmacal Corp., 8 Cir., 64 F.2d 217, 220. Utilization of the difference in pressures in the head between the water at the intake and at the outlet to support the seated position of the end plate on the shortened partition is specifically set out in the British patent. The differences in the British patent, which the appellant notes, are not here important to the one element admittedly disclosed by that patent and used by Price, namely, the shortened partition with its consequently smaller internal chamber for the outgoing fluid.

The appellant argues that the British patent's prior disclosure of the particular element used by Price is unimportant; that the question of the novelty of the elements of a new combination taken seriatim is moot, citing Heim Grinder Co. v. Fafnir Bearing Co., D.C.Conn., 13 F.2d 408; and that the elements of a claimed combination are presumed to be old, citing Johnson Automobile Lock Co. v. Noser Instant Auto Lock Co., 8 Cir., 9 F.2d 265. As much will readily be conceded. Unquestionably, invention may be present if an element or elements priorly known are combined in such a way with other elements, either new or old, so as to produce an entirely new and useful result or function. The invention, in such circumstances, rests in the novel result produced by the combination,—a result which is entirely separate and distinct from the service performed by any or all of the elements or by a mere aggregation of them. In Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 318, 29 S.Ct. 495, 500, 53 L.Ed. 805, where the Supreme Court defined a combination as a "union of elements, which may be partly old and partly new, or wholly old or wholly new", the court then said "But whether new or old, the combination is a means—an invention—distinct from them [the elements]". And in H. Ward Leonard, Inc. v. Maxwell Motor Sales Corp., 252 F. 584, 593, the conception of invention growing out of a combination of elements was well expressed by the Circuit Court of Appeals for the Second Circuit where it was said that "The invention [a mechanical combination patent] consists in the act of selecting some of these elements [old in the art] for a combination which constitutes an independent entity, serviceable to the art and theretofore unknown. It is always this choice of the proper elements *in combination* which constitutes the invention." (Emphasis supplied.) But when the elements are not united so as to produce a new and useful result which is the simultaneous or successive product of all of the elementary parts co-acting as a single entity, there is no invention. See Walker on Patents (Deller's Ed.) § 41, p. 217.

Price combined nothing. By mechanical adaptation, he was able to aggregate two old elements and thus use both. Together (i. e. in combination) these elements performed no new function. The cover, as always, serves as a closure for the opening in the head, and the internal compartment, reduced because of the shortened partition, serves just as before as a chamber for the water as it comes from the tubes in the head. The adaptation involved no more than the engineering skill which the Milwaukee drawings and the British patent invited. True enough, the Milwaukee design was impracticable from a construction standpoint according to the plaintiff, but it, none the less, clearly pointed out that interference from the full length partition in the head had to be eliminated before a "manhole" cover could

be utilized. The British patent showed how the partition could be shortened sufficiently to admit of the use of a "manhole" cover and it further showed that the outlet chamber, of which the partition formed one side, would be sustained in place by the greater pressure of the water in the inlet chamber. What the Supreme Court said in Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 355, 356, 59 S.Ct. 897, 899, 83 L.Ed. 1334 is particularly apposite to the claimed invention in this case, "The problem patentees set for themselves was to prevent extinguishment [of a signal torch] while preserving usefulness of the flames as warning signals. They solved it by merely bringing together the torch and cap. As before, the torch continued to produce a luminescent, undulating flame, and the cap continued to let in air for combustion, to protect the flame from wind and rain and to allow it to emerge as a warning signal. They performed no joint function. Each served as separately it had done. The patented device results from mere aggregation of two old devices and not from invention or discovery." For the same reason, we approve the trial court's finding of a want of invention.

The judgment of the District Court is affirmed.